The United States Court of Appeals for the Federal Circuit is now open and in session. Thank you. Please be seated. Our first case today is number 2017-1178, American Innotek v. United States. How do I pronounce your last name? His name is Daniel Ernstberger. Okay, Mr. Ernstberger, please proceed. Good morning. My name is Daniel Ernstberger. I represent American Innotek in this case. This is a patent infringement case involving a urine collection bag. This urine collection bag makes use of a very special kind of superabsorbent polymer. This particular superabsorbent polymer does a unique thing. It separates the incoming urine in the urine collection bag into two parts. The first part is a gel, which is sort of the expected result of the use of a superabsorbent polymer. And the second part is an unsequestered liquid, which is the surprising part of the superabsorbent polymer. That's why we call this a gel-able hydrophilic material, because it is not an ordinary superabsorbent polymer. It forms a gelled mass at the bottom of the bag, and also it forms a liquid layer, which is the unsequestered liquid. And for 30 seconds, they coexist in the bag. And after 30 seconds, it all becomes gel. So this is the temporary phenomenon when the gelling is still underway and not completed? Well, I don't think that's quite the way to say it. The prior art has gel that is sort of liquidy that goes to a solid gel. It's a transition. That's what all prior art superabsorbent polymers do. It forms a thin gel to a thick gel. This is different because it forms a gel at the bottom, and floating on top is a liquid, which is not part of the gel. It's physically separable. I have an exhibit. I'll show you that. This is the urine collection bag. The Air Force pilot goes on extended missions. They eat lunch, sometimes dinner. They certainly urinate. They urinate into the top of the bag. It goes down through the funnel, mixes with the polymer. The polymer forms this gel at the bottom with the liquid floating on top. When the bag is finished used, it's closed. I want to illustrate the separation of the liquid from the gel. For that purpose, I brought a video clip from the defendant's expert. This is Mr. Richard Moran. He's the expert witness for the defendant. He is testing plaintiffs' urine collection bag that is in this case. At this point of the video clip— I'm sorry. When you say plaintiffs, that's in the case. It's not the accused product. It's just your embodiment of your own patent. He is testing the accused product. Oh, the accused product. He is saying at this point in the video that the accused product does not leak. He says, I would have to say it does not leak. It's doing what it's supposed to do. When the Air Force pilot is using the urine collection bag, he can turn it upside down and it will not leak. That's what he's saying in this part of the video. To answer your question, what I really wanted to show you was that when he's turned this bag upside down, there are two parts. This white part, snowball-looking part, is the gel. That is the conventional thing that everybody thinks of when they say gel. Below it is a murky liquid that sits beside the funnel, at the bottom of the funnel. They are physically separated. When he turned the bag upside down, the liquid drained out of the gel and landed on the funnel down here. Is that an unsealed bag? Yes, this is unsealed. This is the bag, and it is open, and it remains open down here. The fluid would like to just flow right down, but it's not flowing right down. That's the really remarkable thing about this. There are two things that you need to understand about this to understand validity. The first thing is that there is a liquid that separates from the gel. If you look at all the prior art patents, you will see that there's a gel. It goes from a transition of soft gel to hard gel, but there's only one gel. There's no liquid. If you look at the prior art inventions, if a person of ordinary skill of the art looks at those patents, they will make a bag without a funnel. You see, all the prior art patents have a gel with no separate liquid. They would say, okay, I have gels, no liquid, I don't need a funnel. The natural course, the expected course of an invention would be to form a gel here and no funnel because they don't need a funnel because there is no liquid. That is the first thing that is really important that you need to know about this patent. Am I remembering incorrectly or correctly that the prior art product, the pittle pack with sponge, had a funnel? Yes. Then the Mil-Spec B, I don't know whether it was A or B, it doesn't matter, they were both prior, said you can use a sponge or granular material. If you were starting with the widely used pittle pack with sponge with a funnel and as prices for super absorbent material came down and they became more familiar, why wouldn't you just use that in the same bag that you had the sponge in before rather than saying, oh, I don't need the funnel, take it out. Okay, let's go with that thought. I like that thought. Let's go with it. That's the second point I want to make here. The pittle pack is the same as this bag except that it has a sponge here instead of the hydrophilic material. When water enters the sponge or urine enters the sponge, it drains out of the sponge and goes zooming right through this funnel. That's why the CRAM study was done. That's why they found that the urine collection bag, the Benzel bag, was unsanitary and unsafe. They don't want urine splashing all over the cockpit. In the Benzel product, this is a sponge. The urine goes in, the urine comes out, and it splashes all over the cockpit. That's just the way this same identical funnel works with a sponge. The really remarkable thing about this patent is that it doesn't flow out. If a person of ordinary skill in the art were to look at the Benzel bag, they'd say it's going to flow out because that's what it does. The CRAM study confirmed that. But this one doesn't. That's what's really remarkable about this particular urine collection bag. What about the fact that what the court relied on was Benzel as modified so that instead of using a sponge, there would be the granulate material? Let's talk about what the court relied on. There were two attempts to prove how this worked. The first attempt was by the trial testimony. Mr. Richard Moran said that the reason why this works and the Benzel bag does not work is because there's a change in viscosity. That's what he said in his pretrial statement at page appendix 156. In the appendix, in his pretrial statement, he says this works because there's a change in viscosity. But they never repeated that at trial. And the reason why he couldn't repeat it at trial is because there's no prior art to suggest that this will work, that the fluid will not flow right through. There's no prior art to say that the viscosity will change. There's no prior art to say that the change in viscosity will stop the fluid from going through. And so they couldn't say that at trial, and they didn't say that at trial. Now, to answer your question, how did the judge come to that conclusion? The way she did it is she misquoted the testimony. I would like you to look at appendix page 62. That's her testimony. I mean, that's her quote of the testimony. And in her quote of the testimony, appendix page 62, she says that the physical properties change, dot, dot, dot, and therefore it doesn't flow out. However, the complete testimony that she should have included without the dot, dot, dot, says that physical properties change, but we don't know why. Even today, with 20-20 hindsight, we still don't know why this fluid does not flow out. Can I ask you, I understand the points that you're making today, but one of the problems with your argument is that maybe the claim that I don't see where this is claimed. I mean, the claim doesn't talk about turning it upside down and absolutely nothing will ever come out. It just talks about having particular structural properties and those seem to be satisfied by the combination that was relied on by the trial court. Right, OK. In terms of the claim, it says prevent escape. It says that this particular structure prevents escape of the liquid. And so it gives structural elements, the powder in the bag, and it gives the funnel a structural element, and it gives the closure a structural element. But throughout the claim, it says as a result it prevents escape. Preventing fluid from being expelled from the bag? Yes. OK. And there's two parts of the claim. One is preventing the escape before 30 seconds, and the other part is preventing escape after 30 seconds. The one claim element, the funnel prevents escape before 30 seconds. The full gelation prevents escape after 30 seconds. And then after the whole process is completed, then they seal the opening here. But yes, the claim is made that it is a functional prevents escape kind of product, and that's why it is so important. But what I would like you to do is compare the trial court's statement on page 62 to the claim construction hearing, which you quoted on page 105. And if you compare those two pages, you will see that by using three dots, the trial court eliminated the uncertainty that exists today as to why this happens. Mr. Arnsberger, you're using up your rebuttal time. Do you want to save any? I'll just run one more minute, and then I'll be done. The other thing I wanted to say is that there is clear evidence of non-obviousness based on objective indicia. Defendant's expert says that this is in his report and the trial. He says, whether others copied the claims and invention weighs in favor of non-obviousness. And then he says, as a fact, that he looks to as important, although military specification permitted the use of granular hydrophilic material, it appears the NYCIB only began making the pittle fact with powder after learning of the Initech invention. And this is his words. Defendant's expert is saying, this is objective evidence that weighs in favor of a finding of non-obviousness. Yes, I'll reserve the rest for rebuttal. Mr. Fargo. Thank you, and may it please the Court. The obviousness case that we presented is, I think this Court has recognized, focuses on the structure of the accused device. It's that the holding is basically, if the claims cover the accused device, they'd be invalid for obviousness. We have also two alternative bases for affirmance I just wanted to mention. The Court obviously doesn't need to get to them if it agrees that the decision of the trial court should be affirmed. But otherwise, there's also a failure of proof on a means plus function limitation, and a claim construction issue which was based purely on de novo. I'm sorry, on intrinsic evidence, so it's reviewable de novo, which also would lead to non-infringement and the same result, judgment for the government. A couple of things on obviousness. Can I ask you about the portion of the obviousness analysis before one gets to secondary considerations? Yes. And my recollection is as follows, and tell me whether it's right or wrong or complicated. Sure. Anyway, make it correct. The trial court said it was quite obvious to take the Piddleback with sponge bag, which kind of is represented in the prior art Benzel, and substitute for the sponge a super-absorbent polymer. Yes. That by itself, without more, doesn't get to the limitation that I think the other side is focusing on. Such that flow of any unsequestered fluid within said bag back towards said funnel means acts to close said funnel means to prevent escape of said unsequestered fluid. And how does one, and what does the evidence say, and what did the trial court find about why it was obvious to meet that limitation? What the trial court specifically found was the B specification requires also some internal means of preventing escape of fluid. And that is the funnel means that is in the Benzel bag and in the Piddlepack with sponge. It also found that specification required no more than 30 milliliters escape by virtue of having the fluid flow among the sides of the bag, which by the way is also disclosed in Benzel as a mechanism of preventing escape. And that requirement of, you know, 30 milliliters is in the B specification. I'm sorry, where in the trial court's opinion does it say, and it would be obvious to meet this admittedly functional, non-structural requirement, and I can imagine you have an inherency argument, so that might be your answer. But first start with what did the trial court specifically say about that claim element? Yes. It said to Appendix 64, and it says, Mill Spec B describes your containment bag with an opening or neck of the bag that incorporates means for preventing spillage. When the bag is inverted, it shall not impede flow input. It then goes to the court's claim construction of no more than 30 cubic centimeters shall escape. And then it concludes, Mill B, Spec B discloses this exact limitation in its inverted leakage test. So that's where the court got there. Now, as you recognize, we also have the argument of inherency that basically this is a statement of intended result because it's a claim to structure. And the structure of the accused pittle pack with powder results from the substitution of the superabsorbent polymer for the sponge. Did the evidence indicate, and did the CFC find that, I guess those are two separate questions, that regardless of what particular superabsorbent polymer you use, this property will inherently result? I think it found it. I don't think it found it specifically for the pittle pack. But what the evidence does show, because we're talking about the same structure, is that when you make that substitution, and the polymer we use, which is disclosed in Sherman, is sodium polyacrylate. And the trial court did note that the same polymer was disclosed in the prior art, as is used in the pittle pack with powder, as is described in the patent also. I do want to mention one thing. The appellate's counsel said that some special superabsorbent polymer is used. There's no testimony that that's the case. It's sodium polyacrylate. There's nothing in the patent that really talks about any really special properties.  And that's preceded by a statement that commercial is suitable, commercially used superabsorbent polymers are regularly used in diapers, amongst other things. So there really isn't any testimony. With regard to the liquid layer, this is the process of gelation. There's no real chemical change. There's certainly no testimony that there was any. So I think that our point, as we've said, is in terms of teaching, Sherman and the admissions made, both in the patent and by the inventor and American Intertext expert, that indicates that polymers were commonly used, particularly sodium polyacrylate, to absorb urine and to absorb liquid. Suggestion is in the B-spec. Motivation is in the unrebutted testimony of Mr. Moran that by the time the invention was made, superabsorbent polymers, because of their widespread use in disposable diapers, had become cheaper than sponge. It's clear economic motivation. The Gelsa patent notes that they are preferable to sponges. They work better for absorbing urine. There is no reference that teaches against- And that's in part because when you squeeze the bag, when you squeeze a sponge, the liquid comes out. Not true of the gel? Yes. The Gelsa has a statement that's similar to a statement in the Young patent on that advantage. So for these reasons- Can I ask you something? Sure. I know I'm going to switch to the objective indicia. Yes. So it seems to me that the opinion of the trial court several times made an overstatement about a kind of categorical principle that when the prima facie case, the arc-based side of the obviousness analysis is strong, secondary considerations cannot overcome that. And most of what the opinion cites doesn't say that. One passage in one opinion has a sentence that can be read that way, but we've, I think, pretty consistently made a much more context-specific judgment. Is that an error that requires reconsideration? No, I don't think so. I think if you read fairly, and I'll agree with you that you can find a passage here and there that seems to set up- Well, maybe just here. I'm not sure I found one except for one sentence in one. Yes. But if you take a look, I think, as a whole at what the trial court did, first it carefully considered objective evidence, it would be error not to. Second, it withheld a decision on whether or not the claims had been proven obvious until it had weighed and considered objective evidence, which is what I think the court requires. Certainly, even in a case like Behr v. Watson, where the panel of this court reversed the district court's finding of non-obviousness and held that the claim would have been obvious, the words prima facie are never used in that opinion. But what the court does after noting that, yes, there is objective evidence, it goes on to discuss the teachings of the prior art in ways and determines the invention would have been obvious. And I think that's what the trial court does here as well. It takes a look at the objective evidence, which I would say is not compelling. There's some evidence of commercial success. It's a two-year span. There's no indication of how it stacks up in the marketplace. It's really just American Intertech selling one and perhaps being more interested in selling their somewhat more expensive brief relief than Restop. But it's that. The trial court did give some weight to long-felt need, but it's not compelling. If you take a look at the PRAM study, out of 600 questionnaires, only 15 responses that really said, this is something we really need. That's not something that bespeaks a long-felt need. And copying, in terms of copying, the only thing that was copied was the use of super-absorbent polymers to absorb and gel urine, something that had been done. Right, but I thought that your basic theory is that if you take the old ad, replace the sponge with super-absorbent polymer, we've now arrived at the thing, at the claimed invention, and yet that wasn't done for a long time, and that appears to have been copied. They're by one company, but in the George Martin case, which the trial court relies on, it indicates that you need more. There are several other features of the product that were not copied. And those kind of segue into two things I did want to discuss before I run out of time, which is also the closure means issue. 112, paragraph 6, makes it clear that just performing the function isn't enough. A means-plus-function claim never covers just the function. And general reference, as we said, to the roll-and-fold closure being some kind of clamp also is insufficient. There had to be some comparison, and none was there. And the spec here has what, ziplock plus clamp? Ziplock plus a tubular clamp, sometimes referred to as a seal tube. And that one, the accused one, is a roll-and-fold. It has just the roll-and-fold. The IMS case doesn't absolve American in attack of the burden to show that a different structure in the accused device function isn't an equivalent thereof. One of the things – well, the other thing I'd like to point out is the trial court's finding regarding the lack of nexus on commercial success tends to indicate that the ziplock feature is important and distinct from roll-and-fold, substantially different. But the other thing I'd like to point out with respect to this issue is American in attack's reliance on unsupported arguments to argue that somehow the roll-and-fold closure is interchangeable with either the ziplock or the seal tube also highlights the failure of proof. There's no testimony these were interchangeable. No witness called the roll-and-fold a rudimentary zipper lock. It's not clear how it would be. They're not the same national stock number. They have the same prefix, but the prefix for plumbing covers a number of items. Surely they can't all be interchangeable. So all of these things indicate really that there was no comparison. And if the court wishes to, it can affirm the judgment on that basis because it's not a fact issue. It's really something where they haven't shown. And no reasonable finder of fact could conclude that the roll-and-fold closure is an equivalent of either the zipper lock 43 or the seal tube 34. The other one that I'd like to mention just in the last minute because it's another alternative basis is free-from-attachment. The claim structure sides meeting at opposite edges suggests the edges are part of the side. In the accused's advice, just to make it clear, the open bottom where the slits are to allow urine to pass are attached to the edge of the bag. They're attached to the seam in the accused's advice. They're not that way, I would suggest, either in Figure 8, which shows a clear internal line, or in Figure 1 of the young patent. That's not the way. And free-from-attachment, the specification also refers to 16 and 18, which are first called the side edges, as sides. So free-from-attachment of the sides, we think, ought to have been construed to mean the open bottom is not attached to the seam as it is in the accused's bag. In that case, there's no literal infringement. There is a festal presumption because the claim was narrowed from space apart from the sides to free-from-attachment to the sides. That festal presumption has not been rebutted. And that would mean there is no infringement on that alternative basis. So in sum, basically, if the claims read on the accused product, it's a simple substitution for which there's no real downside. Nothing suggests against it making that substitution. The trial court properly credited the testimony of Moran and the evidence. No clear error has been shown. And for that reason, this case, the trial court's opinion ought to be affirmed. Thank you, Mr. Fargo. Mr. Ernstberger, we'll add one more minute to your rebuttal time. Yes, I think a key part of this case is to say that the inherent property of a superabsorbent polymer is that it forms a gel. There's nothing inherent about superabsorbent polymers that they form an unsequestered liquid. It's like looking up at the stars at night. You see lots of stars that are scattered in the sky and you can't tell the difference one from the other until someone points to that one and says it's a supernova and that one says it's a nova. The same is true here. All the polymers look alike until somebody says this particular polymer forms, splits the substance into an unsequestered liquid and a gel. Until Mr. Young said that, all the stars looked alike, all the polymers looked alike. If you look at the particular patent in this case, they talk about polyacrylates, sodium polyacrylates. But the one that was successful, the Wetlock or whatever they called it, was a starch-grafted polyacrylate. They use the word starch-grafted when they talk about that. So he's saying that there's a difference. Not all polymers are the same. Some are different. Mr. Young, when he invented this patent, said that this is different because for that 30-second window, there is a separation between the gel and the unsequestered liquid. Also, on the issue of infringement, there is a means for claim. In means for claims, there is an issue of whether the physical structure is of little or no importance to the claimed invention. We can see Mr. Richard Moran showing us that the opening is of little or no importance to the invention because this works and the opening is wide open. This is the fiddle pack. It was designed, they claim, to be sort of a ziplock. You're well over your rebuttal time, so we really have to move this. I thank both counsel for their arguments and the case is taken under submission. Thank you for your attention to this case. Thank you very much.